**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PROGENYHEALTH, LLC, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: |
| | : | |
| v. | : | |
| | : | |
| PROGYNY, INC. | : | |
| | : | |
| Defendant. | : | |
| | : | |

## **COMPLAINT**

Plaintiff ProgenyHealth, LLC ("ProgenyHealth"), by and through its undersigned counsel, alleges as follows against Defendant Progyny, Inc. ("Progyny").

## **NATURE OF THE ACTION**

1. This is an action for trademark infringement, false designation of origin, unfair competition, and related relief under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), as well as under the common law of unfair competition.

2. ProgenyHealth seeks to stop Progyny from using the confusingly similar PROGYNY mark in a newly entered maternity case management space that directly overlaps with ProgenyHealth's long-standing PROGENY and PROGENYHEALTH branded maternity case management services. ProgenyHealth alleges that, for years, Progyny operated as a fertility-benefits company selling direct-to-employer,, an adjacent but non-overlapping space, but that its recent expansion into pregnancy and postpartum care -- under the PROGYNY mark and with the expanded health plan market offering -- has created pervasive marketplace confusion, including numerous documented instances in which sophisticated health plan clients and members have mistaken one company for the other.

3.     ProgenyHealth further alleges that Progyny, a much larger, publicly traded company, is leveraging its superior scale and visibility in a way that risks overwhelming ProgenyHealth's senior rights and goodwill, and that public reports concerning investigations into possible securities law violations and stock price declines have a tendency to be misattributed to, and unfairly tarnish, ProgenyHealth when confusion between the marks occurs. This scenario presents a textbook base of "reverse confusion," which occurs when a larger, junior user overwhelms the market with a similar mark, causing consumers to mistakenly believe the senior user's products or services come from -- or are affiliated with -- the junior user.

4.     ProgenyHealth seeks injunctive relief, damages, disgorgement of profits, corrective advertising, attorneys' fees, costs, and any other relief the Court deems just and proper.

**THE PARTIES**

5.     Plaintiff ProgenyHealth, LLC is a limited liability company organized under the laws of Delaware, with its principal place of business at 450 Plymouth Road, Suite 200, Plymouth Meeting, Pennsylvania 19462.

6.     Upon information and belief, Defendant Progyny, Inc. is a corporation organized under the laws of Delaware, with its principal place of business at 1359 Broadway, 2nd Floor, New York, New York 10018.

7.     Upon information and belief, Progyny conducts substantial business throughout the United States, including in this District.

**JURISDICTION AND VENUE**

8.     This Court has subject-matter jurisdiction over the federal claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

2

9. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over Progyny because Progyny has purposefully availed itself of the privilege of conducting business in this District, including through marketing, advertising, solicitation, and provision of the accused services.

11. Venue is proper in this District under 28 U.S.C. § 1391 and applicable provisions of the Lanham Act because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Progyny is subject to personal jurisdiction here.

### **PROGENYHEALTH AND ITS PROGENY TRADEMARK**

12. ProgenyHealth is a national healthcare company that partners with health plans, employers, and other channel partners to deliver specialized maternity case management ("Maternity Case Management"), Neonatal Intensive Care Unit ("NICU") utilization management and case management ("NICU Care Management") and NICU claims review services ("NICU Payment Validation and Assurance" or "NICU PVA"). Through its programs, ProgenyHealth provides support from the early identification of pregnancy through delivery and up to 12 months postpartum, with particular expertise in managing high-risk pregnancies and premature and medically complex newborns and their families. By providing Maternity Case Management, NICU Care Management, and NICU PVA, ProgenyHealth helps payors improve maternal and infant health outcomes, reduce avoidable NICU admissions and readmissions, and manage the significant costs associated with pregnancy, childbirth, and infant care. See Exhibit A, which consists of printouts from ProgenyHealth's website describing its business.

13. ProgenyHealth was founded in 2003 by Dr. Ellen Stang to address the need for improved care management and health outcomes for premature and medically complex

newborns. Through Dr. Stang's leadership and vision, the company has grown steadily over more than two decades into a national leader in Maternity and NICU Care Management.

14.    ProgenyHealth is based in Plymouth Meeting, Pennsylvania, and serves health plans, employers, and other channel partners, and has supported hundreds of thousands of families across the United States. The company has over 20 years of experience in transforming healthcare for women, infants, and families through evidence-based care management, proactive risk identification, personalized intervention, and whole-person support.

15.    ProgenyHealth's services are designed to improve maternal and infant health outcomes, reduce preventable complications, lower NICU admission rates, and reduce the overall cost of care for payors and health plans. The company's model is grounded in clinical excellence, member engagement, and physician collaboration.

16.    ProgenyHealth has used the PROGENY HEALTH and PROGENY trademarks (collectively "PROGENY") continuously since its founding in 2003, is widely known and referred to in its industry as simply "PROGENY," and throughout its history has consistently emphasized the "PROGENY" element in its PROGENYHEALTH mark, including by using larger or bolder type for "Progeny" in its logo and marketing materials (as shown immediately below) -- reinforcing "Progeny" as the primary, attention-grabbing, and source-signifying element that consumers, clients, and industry participants first notice and remember:



17.    By consistently featuring PROGENY as the standout, dominant portion of its PROGENYHEALTH mark in connection with Maternity Case Management, NICU Care Management, and NICU PVA services, ProgenyHealth has built substantial goodwill specifically

in the "Progeny" name, making it especially vulnerable to confusion when a larger and better financed competitor like Progyny adopts the nearly identical PROGYNY mark for directly overlapping services.

18.    As can also be seen in ProgenyHealth's logo mark, particular emphasis is placed on newborn and maternity care, as the letter "g" in the mark comprises a mother holding an infant child.

19.    Since at least November 2021, ProgenyHealth has used its PROGENY mark for its maternity case management solution. ProgenyHealth's maternity case management services encompass a comprehensive, end-to-end program that supports health plans, employers, women, infants, and families from early pregnancy identification through delivery, postpartum recovery, and up to 12 months after birth. Key components of the program include: (a) complex case management for high-risk pregnancies, with certified maternity case managers developing personalized care plans in coordination with obstetricians; (b) return-to-work planning to ease workforce reintegration; (c) parenting support covering topics like pediatrician selection, immunizations, lactation, and sibling introduction; (d) a centering pregnancy approach that groups women at similar stages for peer support and education; and (e) a mobile app for tracking pregnancy progress, creating custom birth plans, accessing health insights, appointment scheduling, and connecting with health coaches and peer networks.

20.    ProgenyHealth's holistic approach to Maternity Case Management aims to improve maternal and infant outcomes, enhance member satisfaction, and lower healthcare costs associated with pregnancy, childbirth, and infant care. ProgenyHealth has consistently and prominently utilized the PROGENY mark in association with its maternity case management

program. This includes its appearance on program materials, digital platforms, care management communications, and outreach initiatives targeting health plans, employers, and members.

21.    ProgenyHealth's use of the PROGENY mark has been continuous, prominent, and in interstate commerce. The mark has been used in client communications, promotional materials, business development materials, presentations, digital communications, email signatures, website content, member-facing portals, and other channels through which ProgenyHealth identifies itself and its services to customers, clients, and the public.

22.    Through its sustained use of the PROGENY mark, ProgenyHealth has built valuable goodwill, marketplace recognition, and source-identifying significance in the maternity case management space. The mark has become associated with ProgenyHealth's reputation for clinical expertise, member-centered care, and measurable improvements in maternal and infant health outcomes.

23.    ProgenyHealth owns valid and subsisting federal trademark registrations and applications for marks incorporating PROGENYHEALTH and PROGENY, including U.S. Registration No. 6,961,798 for PROGENY HEALTH in International Classes 36 and 45; U.S. Registration No. 6,961,796 for PROGENY HEALTH in International Classes 36 and 45; U.S. Registration No. 5,959,060 for PROGENYHEALTH in International Classes 35 and 45; and U.S. Registration No. 4,113,776 for PROGENYHEALTH in International Classes 35 and 45.

24.    These registrations cover, among other things, medical insurance case and utilization review, insurance claims adjustment services for healthcare purchasers and payors seeking neonatal and maternity care, case management services coordinating medical services for pregnant women and maternity care recipients, healthcare utilization and review services, and patient advocate and case management services relating to neonatal care. See Exhibit B, which

6

includes printouts showing ProgenyHealth's trademark registrations for its marks in the U.S. Patent and Trademark Office.

25.     ProgenyHealth's Registration No. 6,961,798 issued on January 24, 2023, based on an application filed December 21, 2021, Registration No. 6,961,796 issued on January 24, 2023, based on an application filed December 21, 2021, Registration No. 5,959,060 issued on January 14, 2020, based on an application filed February 26, 2019, and Registration No. 4,113,776 issued on March 20, 2012, based on an application filed August 27, 2010.

26.     ProgenyHealth has also filed Application No. 99,493,037 for PROGENYHEALTH in International Class 9, covering downloadable mobile application software for tracking and managing pregnancy and early childhood development, including monitoring pregnancy status, fetal growth and development, recording prenatal appointments, tracking health and wellness data, and providing news and educational information and tips about pregnancy, childbirth, infant care, and early childhood milestones. That application was filed on November 12, 2025.

27.     The PROGENY mark functions as a designation of source for ProgenyHealth's services and is associated by customers, clients, and industry participants with ProgenyHealth and the quality and reputation of its offerings.

28.     ProgenyHealth's rights in the PROGENY mark predates both Progyny's original use of "Progyny" for its core fertility-focused services and its currently challenged expansion into maternity case management and related pregnancy and postpartum services.

29.     ProgenyHealth's senior use of the PROGENY mark is especially important in this field, including maternity case management services, because healthcare services depend heavily on trust, continuity, reputation, and brand recognition. Confusion as to the source of maternity

and infant care services can directly affect member care, clinical outcomes, provider coordination, and payor relationships.

## PROGYNY'S BUSINESS AND CONDUCT

30.     Upon information and belief, Progyny is a large, publicly traded healthcare benefits company with substantial financial resources, significant market reach, and a broad national presence in the employer-sponsored benefits and health plan marketplace. See Exhibit C, which consists of printouts from Progyny's website describe the size and scope of its business.

31.     Progyny was incorporated in Delaware on April 3, 2008, and maintains its corporate headquarters in New York, New York. Progyny became a publicly traded company on October 25, 2019, when its shares began trading on the Nasdaq Stock Market under the ticker symbol PGNY.

32.     As of early 2026, Progyny's market capitalization is in the range of approximately $1.4 to $1.5 billion, making it a well-capitalized company with substantial marketing, operational, and brand-building resources far exceeding those available to ProgenyHealth.

33.     Upon information and belief, Progyny employs over 500 to 600 professionals and serves more than 135 employer-clients, providing coverage for over 2.1 million lives nationwide. Progyny's clients include many of the nation's most prominent employers across a broad array of industries.

34.     Progyny has positioned itself as a leading provider of fertility and family-building benefits, and has historically focused on fertility treatment services, reproductive endocrinology, in vitro fertilization, and related fertility benefits management for employer-sponsored health plans.

8

35. Upon information and belief, Progyny historically provided fertility related healthcare benefits services to employers, health plans, and other enterprise customers across the United States. Progyny's services are delivered to members through a combination of dedicated patient care advocates, digital tools, technology platforms, and a national network of healthcare providers.

36. Progyny's business model is built on a membership-based structure under which employers purchase comprehensive fertility coverage for their employees. Progyny generates revenue primarily through per-member-per-month fees and achieves scale through its national employer-client base.

37. Progyny's size, public-company status, and marketing reach enable it to project its brand broadly and aggressively in the marketplace, with a reach and force far exceeding that of ProgenyHealth. Progyny has undertaken substantial marketing campaigns, including its 2024 "Family Matters" initiative and its 2023 rebranding campaign "It's Not a Benefit, It's a Progyny," which generated over 15 million impressions and was credited with contributing to significant sales growth.

38. As noted, for many years, Progyny's core business has centered on fertility and family-building benefits, a space that, while adjacent to ProgenyHealth's focus, did not directly overlap with ProgenyHealth's maternity case management services. However, in or around early 2025 – more than three years after ProgenyHealth began offering maternity case management services under its "PROGENY" trademark and registered its "PROGENY" trademark for such services -- Progyny expanded its offerings beyond fertility into maternity case management, including pregnancy and postpartum support, thereby moving into the very domain in which ProgenyHealth has long operated. This expansion has transformed what was once a neighboring

9

line of business into a directly overlapping set of services, increasing the likelihood that clients, members, and industry participants will encounter similar marks—PROGENY and PROGYNY -- in the same maternity care context and mistakenly believe the companies, their programs, or their services are affiliated or originate from a single source.

39.     More specifically, upon information and belief, since at least early 2025, Progyny has expanded its offerings beyond fertility services into pregnancy, postpartum, and related maternity care support and services. Progyny now promotes prominently its "Pregnancy and Postpartum Care" program, which it describes as providing comprehensive maternity support from pregnancy through postpartum and return-to-work, including personalized clinical guidance, emotional support, logistical expertise, risk assessments, curated education, and on-demand access to multidisciplinary maternity experts including registered nurses, certified doulas, and lactation consultants.

40.     In a March 31, 2025 press release, Progyny announced that it was "expanding its support throughout the maternal health journey with the addition of doula services," describing these in-person and virtual doula offerings as part of its "comprehensive maternal offerings" and "Pregnancy and Postpartum program" that provide high-touch maternity support, clinical coaching, education, and access to certified doulas and lactation specialists. Progyny further emphasized that these services are designed to support members across the pregnancy journey— from prenatal care, through labor, to postpartum, lactation, and even miscarriage and loss support—positioning itself as a "global leader in women's health and family building solutions" that now offers end-to-end maternal health benefits. See Exhibit D, a copy of the March 31, 2025 press release.

41.    Progyny's expansion into pregnancy, postpartum, and doula-based maternity care under the PROGYNY mark places Progyny squarely into the core maternity case management space in which ProgenyHealth has long operated under its PROGENY mark, thereby transforming Progyny from a primarily fertility-focused benefits provider in an adjacent market into a direct competitor using a confusingly similar mark in the same maternity care channel of trade, including selling and marketing such services to the very same clients to whom ProgenyHealth sells and markets its maternity case management services.

42.    On or about October 21, 2025 -- months after ProgenyHealth objected formally in August 2025 to Progyny using the "PROGYNY" trademark in connecting with these overlapping services (as further discussed below) -- Progyny additionally publicly announced the launch of its pregnancy, postpartum, and menopause programs for global employers, available starting January 1, 2026. See Exhibit E, a copy of the October 21, 2025 press release.

43.    Upon information and belief, Progyny has been actively marketing these maternity-related services to its employer clients and prospective clients, and these programs are now available to Progyny's members. Progyny is also now also explicitly marketing these services to health plans, which directly overlap with ProgenyHealth's own marketing and sales efforts.

44.    Upon information and belief, Progyny's pregnancy and postpartum program includes services such as early engagement and risk identification during pregnancy, expert clinical support from nurses and doulas, decision and emotional support, leave and benefits navigation, return-to-work planning, and coordination with providers. These services overlap substantially with the maternity case management services that ProgenyHealth has been providing under the PROGENY mark since at least November 2021.

11

45.    At its dedicated website page for these new services at https://progyny.com/what-we-do/pregnancy-and-postpartum-care/, Progyny states: "Our program offers comprehensive support from pregnancy through postpartum and the transition back to work, giving employees guidance and reassurance every step of the way. With personalized coaching and help navigating leave and benefits, we make the experience easier for families while improving outcomes for employers."

46.    Upon information and belief, and especially due to the parties' interactions with each other over the last decade related to ProgenyHealth's long-expressed concerns regarding Progyny's adoption and use of a confusingly similar trademark, Progyny was aware of ProgenyHealth's prior rights in the PROGENY mark before or at the time it expanded into maternity case management and related services. Both companies operate in the same healthcare benefits space, serve overlapping institutional clients including health plans and employers, and are known within the relatively specialized field of maternal and infant health.

47.    Rather than adopting a clearly distinct brand, Progyny chose to use the PROGYNY mark in connection with maternity case management, pregnancy support, postpartum support, and related offerings in a manner that is visually, phonetically, and conceptually close to PROGENY.

48.    The PROGYNY mark differs from PROGENY by only a single letter ("Y" instead of "E" in the fifth position), and the marks are pronounced in a virtually identical or highly similar manner. Both marks share the same distinctive prefix "PROG" and the same conceptual root relating to offspring, progeny, and reproduction.

49.    Progyny's conduct has not been limited to passive coexistence. Progyny has continued to use and promote the PROGYNY mark in the overlapping maternity case

management space despite ProgenyHealth's objections and despite repeated notice that such use is confusing and harmful.

50.     Progyny's size and market power have allowed it to press forward with its branding in a way that threatens to overwhelm ProgenyHealth's prior rights and eclipse the goodwill ProgenyHealth has built in the PROGENY mark. Progyny's aggressive marketing, substantial public visibility, and substantial brand campaigns create a significant risk that the public will come to believe that ProgenyHealth's services are derived from, affiliated with, or sponsored by Progyny, rather than recognizing ProgenyHealth as the senior user of the PROGENY mark.

51.     Upon information and belief, Progyny's expansion into this space was undertaken with disregard for the rights of ProgenyHealth and with full appreciation of the risk that consumers, clients, and industry participants would associate the two marks or believe that the companies were affiliated.

## **ACTUAL CONFUSION**

52.     ProgenyHealth has experienced recurring instances of actual confusion in the marketplace because of Progyny's use of the PROGYNY mark in connection with maternity-related services.

53.     In early September 2025, an individual emailed ProgenyHealth stating: "Hello Good Morning, I am reaching out as I work for the City of Philadelphia and I understand that we have partnered with you all to provide Doula coverage. I am interested in this service and would like to understand the next steps and expectations." ProgenyHealth does not offer doula services, but Progyny had begun offering doula-related benefits earlier in 2025, and the inquiry was plainly directed to ProgenyHealth based on confusion between the companies' names and perceived

13

partnership. This incident reflects actual confusion by an end user who believed that doula services marketed in connection with Progyny were being provided by, or through a partnership with, ProgenyHealth.

54.    In the Fall of 2025, a Chief Medical Officer of a nationally recognized health plan, and a valued ProgenyHealth client, was approached by a contact who believed he had applied for a "Senior Director of Client Success" position at "Progeny," a position that does not exist at ProgenyHealth. Believing this reference concerned ProgenyHealth, the Chief Medical Officer contacted ProgenyHealth's Chief Growth Officer to recommend the individual for the purported position, an error directly attributable to the similarity of the marks and the overlapping nature of the parties' services and client relationships. This incident demonstrates that even sophisticated healthcare executives and institutional decision-makers -- individuals who are familiar with the industry and who have direct business relationships with ProgenyHealth -- are confused by the similarity between the PROGENY and PROGYNY marks.

55.    In early November 2025, a health plan member emailed ProgenyHealth stating: "Hello, Starting in 2026, my company will be offering your services for menopause care. I'm interested in learning more about the programs and support you provide in this area so I can get a head start on understanding how Progeny might help me manage my health." The context made clear that the member was referring to menopause support services newly being offered by Progyny -- not ProgenyHealth -- yet the member expressly directed the inquiry to ProgenyHealth and referenced "Progeny" as the provider. This episode underscores how Progyny's use of the PROGYNY mark in adjacent women's health services causes members to misattribute Progyny's programs to ProgenyHealth.

14

56. In another example, an employee or health plan member contacted ProgenyHealth after being told she would gain access to "our" maternity program in 2026, mistakenly believing that the reference was to a ProgenyHealth program when in fact it appears to have been a reference to Progyny's newly launched pregnancy and postpartum program. This incident reflects confusion at the member or end-user level and demonstrates that the confusion is not limited to business-to-business relationships but extends to the individuals who are the ultimate recipients of maternity case management services.

57. In early February 2026, ProgenyHealth's Director of Compliance and Quality received a text message from a former colleague who now serves as Vice President of Compliance at a health plan specializing in long-term care, asking whether ProgenyHealth worked with a company called CapitalRx. The former colleague explained that CapitalRx was representing "Progeny" as a customer. As ProgenyHealth does not work with a company called Capital Rx, a pharmacy benefits management company that partnered with Progyny to support fertility medication management, this outreach to "ProgenyHealth" was the result of confusion between the PROGENY and PROGYNY marks. This episode is a further instance of actual confusion by a sophisticated compliance professional operating in a regulated healthcare context, and it underscores how Progyny's use of the PROGYNY mark leads third parties to misidentify Progyny's relationships as ProgenyHealth's.

58. In advance of the William Blair Benefit Technology Conference in late February 2026, a General Manager from Gravie, a health benefits company, approached ProgenyHealth's Chief Executive Officer seeking a meeting under the mistaken belief that Gravie and ProgenyHealth were already in discussions about collaborating; that collaboration was for maternity case management that could prevent NICU utilization. After meeting at the conference,

the parties realized that Gravie's relationship was actually with Progyny. Following the conference, the Gravie manager indicated that her team was going to focus on fertility benefits. This incident reflects a concrete instance of actual confusion in which a sophisticated industry participant, operating in a professional conference setting, conflated ProgenyHealth with Progyny.

59.    In mid-April 2026, a health plan member contacted ProgenyHealth requesting a "Progeny ID #" to provide to [her] fertility clinic" and inquiring about the information needed to initiate the process. This communication was plainly misdirected and intended for Progyny, as ProgenyHealth does not provide fertility-related services.

60.    These and other incidents demonstrate that the confusion created by Progyny's use of the PROGYNY mark is not speculative, hypothetical, or theoretical, but real, recurring, and ongoing.

61.    The actual confusion is especially serious because it affects both sophisticated institutional actors such as health plan executives and end users such as health plan members and employees, confirming the breadth of the marketplace risk created by the parties' overlapping marks and services.

62.    The actual confusion is likely to continue and intensify as Progyny continues to expand and promote its pregnancy and postpartum services under the PROGYNY mark, particularly given Progyny's substantial marketing resources, public visibility, and large membership base.

63.    As an additional aspect of the harm caused by Progyny's infringing conduct, public reports concerning investigations into possible securities law violations, sharp stock price declines following the loss of a significant client, and related disclosures about Progyny's

financial condition have a tendency to reflect adversely on ProgenyHealth when confusion between the PROGENY and PROGYNY marks occurs. Purchasers, health plan clients, members, and industry participants who mistakenly associate or conflate the two companies may incorrectly attribute such investigations, financial reversals, or perceived instability to ProgenyHealth, or assume that ProgenyHealth is affiliated with a company facing serious investor relations and compliance concerns. This misattribution threatens to tarnish ProgenyHealth's reputation for reliability and stability in a sensitive healthcare sector, undermines the trust it has cultivated with existing and prospective clients, and further magnifies the reputational and commercial harm arising from Progyny's continued use of the confusingly similar PROGYNY mark.

64.    Progyny has additionally represented to ProgenyHealth that it has not experienced market confusion involving the PROGYNY name, which further indicates that when both sophisticated and unsophisticated parties encounter the name "Progeny," they associate it with ProgenyHealth, such that any negative publicity or reputational harm connected to Progyny is likely to be imputed to, and to diminish the goodwill and reputation of, ProgenyHealth.

## LIKELIHOOD OF CONFUSION

65.    The PROGENY and PROGYNY marks are highly similar in appearance, sound, meaning, and commercial impression.

66.    The marks share the same four-letter prefix ("PROG"), the same middle phoneme ("en" or "yn"), and differ by only a single letter in the middle of the mark. The visual and aural similarity is pronounced, and the marks convey the same or closely related meaning, both evoking concepts of offspring, reproduction, progeny, and family-building.

67.    When viewed, heard, or recalled by consumers in the ordinary course of commerce, the marks are likely to be confused with one another, particularly in the context of

17

maternity and reproductive healthcare services where both terms relate conceptually to the same subject matter.

68.     The parties' services are overlapping, closely related, and in some instances identical. Both ProgenyHealth and Progyny offer maternity case management, pregnancy support, postpartum care coordination, case management for pregnant women, risk assessment and intervention, return-to-work planning, care coordination with healthcare providers, and digital tools for tracking pregnancy and health information.

69.     The channels of trade overlap substantially. Both companies market and provide their services to the same categories of customers, including health plans, payors, employer-sponsored benefit plans, third-party administrators, and other institutional purchasers of healthcare benefits. Both companies also interact with and provide services to the same categories of end users, including pregnant women, new mothers, individuals navigating postpartum care, and families seeking support during the maternity continuum.

70.     The target customers are the same or substantially overlapping. The health plan buyers who contract for maternity case management services from ProgenyHealth are the same buyers who contract for maternity services from Progyny. The end users who receive services from ProgenyHealth are the same individuals who may receive services from Progyny through their employer-sponsored health plans.

71.     The marketplace context in which the marks are used is the same. Both marks are used in the healthcare benefits space, specifically in connection with reproductive health, maternity, and family-building services. This is a specialized field in which participants are aware of and familiar with the key providers and in which brand recognition and trust are particularly important.

72.    Progyny's greater size and market power increase the risk of reverse confusion, in which the public will come to believe that ProgenyHealth is the junior user or that its services are affiliated with or derived from Progyny. Progyny's status as a publicly traded company with a billion-dollar market capitalization, its substantial marketing campaigns, its large membership base, and its aggressive brand promotion create a risk that ProgenyHealth's senior rights will be swamped by Progyny's use of the confusingly similar mark.

73.    Reverse confusion is particularly harmful to ProgenyHealth because it threatens to deprive ProgenyHealth of control over its own brand identity, to erode the goodwill ProgenyHealth has built in the PROGENY mark, and to undermine ProgenyHealth's ability to maintain and grow its business relationships with clients who may come to believe that ProgenyHealth's services are secondary to or derived from Progyny's offerings.

74.    The similarity of the marks, the relatedness and overlap of the services, the identity of the channels of trade and target customers, the actual confusion already occurring, Progyny's market dominance, and the risk of reverse confusion create a substantial likelihood of confusion, mistake, and deception as to the source, origin, sponsorship, affiliation, or approval of the parties' services.

**HARM TO PROGENYHEALTH**

75.    Progyny's conduct has harmed and continues to harm ProgenyHealth's goodwill, reputation, brand strength, business relationships, and ability to control its own identity in the marketplace.

76.    Progyny's continued use of the PROGYNY mark in the maternity case management space threatens to erode the distinctiveness and value of ProgenyHealth's PROGENY mark and to cause ProgenyHealth's mark to lose its source-identifying significance.

19

77.     ProgenyHealth has been forced to expend time, effort, and resources addressing confusion caused by Progyny's conduct, responding to inquiries from clients and third parties who are confused about the relationship between the companies, and protecting the integrity of its brand.

78.     ProgenyHealth is at risk of losing business opportunities, client relationships, and market share as a result of the confusion created by Progyny's use of the PROGYNY mark. Potential clients may incorrectly believe that ProgenyHealth's services are affiliated with or derived from Progyny, or may choose to contract with Progyny instead of ProgenyHealth based on confusion about the source and sponsorship of the parties' respective services.

79.     ProgenyHealth's ability to expand its business, build new client relationships, and grow its brand is impaired by the presence of Progyny's confusingly similar mark in the same marketplace and in connection with the same or closely related services.

80.     Unless restrained, Progyny's conduct will continue to cause irreparable harm to ProgenyHealth for which monetary damages are an inadequate remedy.

## <u>PROGENYHEALTH'S EFFORTS TO RESOLVE THE MATTER WITHOUT LITIGATION</u>

81.     After learning of Progyny's first announced expansion into the area of maternity care, ProgenyHealth directed its outside counsel to contact Progyny regarding ProgenyHealth's concern that Progyny's expansion would cause confusion in the relevant marketplace.

82.     ProgenyHealth sent a series of demand letters to Progyny outlining its trademark concerns and proposing business-oriented solutions, including an initial demand letter dated August 18, 2025, a follow-up letter dated October 24, 2025, a November 17, 2025 letter documenting actual confusion and reiterating that coexistence was untenable, and a final demand letter dated February 13, 2026, giving Progyny 14 days to confirm cessation of the PROGYNY

mark in maternity care or face litigation. Throughout its responses to these communications, coupled with a December 1, 2025 call, Progyny disregarded ProgenyHealth's concerns by refusing to alter its branding and continuing its expansion and use of the confusingly similar mark. As noted, Progyny has also doubled down on its infringing strategy, with its announcement of the launch of its pregnancy, postpartum, and menopause programs for global employers, available starting January 1, 2026.

## COUNT I: TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114

83.    ProgenyHealth repeats and realleges paragraphs 1 through 82 as if fully set forth herein.

84.    ProgenyHealth owns valid and protectable rights in the PROGENY mark, including through its ownership of U.S. Trademark Registration Nos. 6,961,798, 6,961,796, 5,959,060, and 4,113,776, which are valid and subsisting federal registrations for marks incorporating PROGENY.

85.    Progyny's use of the PROGYNY mark in connection with maternity case management, pregnancy support, postpartum care, and related healthcare services is likely to cause confusion, mistake, or deception as to source, affiliation, sponsorship, or approval.

86.    Progyny's conduct constitutes trademark infringement under 15 U.S.C. § 1114.

87.    ProgenyHealth has been and will continue to be damaged by Progyny's infringement.

88.    ProgenyHealth has no adequate remedy at law and will suffer irreparable harm unless Progyny's infringing conduct is enjoined.

## COUNT II: FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

89.     ProgenyHealth repeats and realleges paragraphs 1 through 88 as if fully set forth herein.

90.     Progyny's use of the PROGYNY mark in connection with maternity case management, pregnancy support, postpartum care, and related services is likely to cause confusion, mistake, or deception as to the origin, sponsorship, affiliation, or approval of its services.

91.     Progyny's use of the PROGYNY mark in commerce in connection with services that are the same as or closely related to ProgenyHealth's services constitutes a false designation of origin and creates a likelihood of confusion as to ProgenyHealth's affiliation, connection, or association with Progyny, or as to the origin, sponsorship, or approval of Progyny's services.

92.     Progyny's conduct, including its use of the PROGYNY mark in a manner that causes reverse confusion, constitutes false designation of origin and unfair competition under 15 U.S.C. § 1125(a).

93.     ProgenyHealth has been and will continue to be damaged by Progyny's unlawful conduct.

94.     ProgenyHealth has no adequate remedy at law and will suffer irreparable harm unless Progyny's conduct is enjoined.

## COUNT III: VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. § 201-2(4)(xxi)

95.     ProgenyHealth repeats and realleges paragraphs 1 through 94 as if fully set forth herein.

96.    Progyny's use of the confusingly similar PROGYNY mark constitutes "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" under 73 P.S. § 201-2(4)(xxi) of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

97.    Progyny's deceptive conduct has caused ascertainable loss to ProgenyHealth in the form of harm to goodwill, corrective advertising costs, lost business opportunities, and diminished brand value.

98.    ProgenyHealth is entitled to treble damages, attorneys' fees, costs, and other relief under 73 P.S. § 201-9.2(a), to the extent permitted by law.

## COUNT IV: COMMON LAW UNFAIR COMPETITION

99.    ProgenyHealth repeats and realleges paragraphs 1 through 98 as if fully set forth herein.

100.    ProgenyHealth has established common-law rights in the PROGENY mark through its continuous and extensive use of the mark in connection with maternity case management and related services since at least November 2021.

101.    Progyny's use of the confusingly similar PROGYNY mark in connection with the same or closely related services constitutes unfair competition under the common law of Pennsylvania, including but not limited to passing off and misappropriation of ProgenyHealth's goodwill.

102.    Progyny's conduct is likely to cause and has caused confusion, mistake, and deception as to the source, origin, sponsorship, or affiliation of the parties' services.

103.    ProgenyHealth has been and will continue to be damaged by Progyny's unfair competition.

23

104.   ProgenyHealth has no adequate remedy at law and will suffer irreparable harm unless Progyny's conduct is enjoined.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff ProgenyHealth, LLC respectfully requests that this Court enter judgment in its favor and against Defendant Progyny, Inc., and grant the following relief:

A.   A preliminary and permanent injunction enjoining Progyny, its officers, directors, agents, employees, successors, assigns, and all persons acting in concert with them, from using the PROGYNY mark or any confusingly similar mark in connection with maternity case management, pregnancy support, postpartum care, or related services that overlap with ProgenyHealth's offerings;

B.   An order requiring Progyny to recall, destroy, or deliver up for destruction all materials in its possession or control bearing the PROGYNY mark in connection with maternity case management services;

C.   An order requiring Progyny to undertake Court-approved corrective advertising to dispel confusion in the marketplace;

D.   Actual damages sustained by ProgenyHealth as a result of Progyny's wrongful conduct, in an amount to be determined at trial;

E.   Disgorgement of Progyny's profits attributable to its unlawful use of the PROGYNY mark in the maternity case management space;

F.   Enhanced damages, including treble damages, pursuant to 15 U.S.C. § 1117(a) and 73 P.S. § 201-9.2(a);

G.   Attorneys' fees and costs pursuant to 15 U.S.C. § 1117 and 73 P.S. § 201-9.2(a);

H.   Pre-judgment and post-judgment interest; and

I.      Such other and further relief as the Court deems just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff ProgenyHealth, LLC demands a trial by jury on all issues so triable.


Respectfully submitted,

Date:   April 14, 2026                        **FLASTER GREENBERG P.C.**

By:      */s/ Jordan A. LaVine*
         Jordan A. LaVine
         PA Attorney ID: 78503
         Eric C. Palombo
         PA Attorney ID: 307005
         100 Front Street, Suite 100
         Conshohocken, PA 19428
         (215) 279-9389
         Jordan.lavine@flastergreenberg.com
         Eric.palombo@flastergreenberg.com

         Daniel S. Sulvetta
         PA Attorney ID: 328010
         1717 Arch Street, Suite 3300
         Philadelphia, PA 19103
         (267) 681-0466
         Daniel.sulvetta@flastergreenberg.com
         *Attorneys for Plaintiff*